AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Eastern District of Pennsylvania

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )    Case No.  26-mj-201
THE TELEGRAM ACCOUNT DESCRIBED IN )
ATTACHMENT A )
)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____ Eastern _____ District of _____ Pennsylvania and elsewhere _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2252(a)(2) | receipt and distribution of child pornography |
| 18 U.S.C. § 2252(a)(4)(B) | possession/access with intent to view child pornography |

The application is based on these facts:

See Supporting Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
/s/ Brandon Roche
*Applicant's signature*

Brandon Roche, Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ Telephone _____ *(specify reliable electronic means).*

Date:  _____ 02/04/2026 _____

Carol Sandra Moore Wells    2026.02.04 16:25:24 -05'00'
2025.001.20997
*Judge's signature*

City and state:  Philadelphia, PA

Hon. Carol Sandra Moore Wells, U.S. Magistrate Judge
*Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means          ☑ Original          ❑ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Eastern District of Pennsylvania

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>THE TELEGRAM ACCOUNT DESCRIBED IN<br>ATTACHMENT A | )<br>)<br>)   Case No.  26-mj-201<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ Eastern _____ District of _____ Pennsylvania and elsewhere _____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____ February 18, 2026 _____ *(not to exceed 14 days)*
❑ in the daytime 6:00 a.m. to 10:00 p.m.      ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ the Duty Magistrate Judge _____ .
*(United States Magistrate Judge)*

❑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❑ for _____ days *(not to exceed 30)*   ❑ until, the facts justifying, the later specific date of _____ .

Carol Sandra Moore Wells    2026.02.04 16:26:05 -05'00'
2025.001.20997

Date and time issued: _____

_____
*Judge's signature*

City and state:   Philadelphia, PA _____

Hon. Carol Sandra Moore Wells, U.S. Magistrate Judge
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  26-mj-201 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Special Agent Brandon Roche, with the Federal Bureau of Investigation (FBI), being duly sworn, deposes and states the following:

## INTRODUCTION

1.      I have been a Special Agent with the FBI since August 2021. During my employment with the FBI, I have gained experience through training at the FBI Academy and have participated in investigations pertaining to transnational organized crime, child pornography and human trafficking. I have been assigned to the Philadelphia Division's Crimes Against Children Squad since January 2025 and have observed and reviewed numerous examples of child pornography (as defined in 18 U.S.C. § 2256). I am familiar with the definition of child pornography as it is defined under 18 U.S.C. § 2256. I have been an affiant on numerous search warrant affidavits and participated in the execution of many search and seizure warrants involving child sexual exploitation and other violations of federal criminal law.

2.      As a federal agent, I am authorized to investigate violations of laws of the United States, and I am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

3.      This affidavit is submitted in support of a search warrant pursuant to Rule 41(b)(6)(A) of the Federal Rules of Criminal Procedure for law enforcement to use a remote access search technique.  In particular, I request approval for law enforcement to use a remote access search technique to send one or more communications to the servers of the online company Telegram Messenger, Inc. to access the account of "**jrod1010**" that is accessible on the Telegram application on an Apple iPhone 12 Pro seized from defendant Xavier Dory on October 29, 2025 in Philadelphia, Pennsylvania (the "Subject Account"). Each such communication is designed to

cause the servers to transmit information to law enforcement, including Dory's communications and other information from the Subject Account on Telegram. Once that information is downloaded to a computer in this district and/or the iPhone 12 Pro in this district, law enforcement will not attempt to gain access to the Subject Account without approval from the Court through further legal process, if necessary.

4.      Based on the facts set forth in this affidavit, I submit that there is probable cause to believe that violations of 18 U.S.C. §§ 2252(a)(2) and 2252(a)(4)(B), that is, the receipt, distribution, possession, and access with intent to view child pornography (collectively, the "Subject Offenses") have occurred, and that evidence and instrumentalities of the Subject Offenses exist on Telegram servers described in Attachment A and will be accessible on the Telegram application on Dory's Apple iPhone 12 Pro.

5.      Accordingly, this affidavit is made in support of an application for a warrant authorizing a remote access search of Telegram servers for evidence and instrumentalities of the Subject Offenses, as described in Attachment B. Attachments A and B are incorporated herein by reference.

6.      The information set forth in this affidavit is based upon my personal knowledge of this investigation and information conveyed to me by others involved with the investigation, including others with knowledge regarding both the technical aspects of Telegram and how it stores its data. Since this affidavit is being submitted for the limited purpose of establishing probable cause for the requested search warrant, I have not included every detail of every aspect of the investigation known to me or to the government. Rather, the following paragraphs set forth only those facts necessary to support a finding of probable cause.

2

## JURISDICTION

7.    This Court has jurisdiction to issue the requested warrant "to use remote access to search electronic storage media and to seize or copy electronically stored information located within or outside" this District, because the facts below establish probable cause to believe both that "activities related to a crime may have occurred" in this District and that "the district where the media or information is located has been concealed through technological means." Fed. R. Crim. P. 41(b)(6)(A).

8.    In addition, the below facts establish that there is probable cause to believe that activities related to the Subject Offenses being investigated occurred within this judicial district. As discussed more fully below, acts or omissions in furtherance of the Subject Offenses under investigation occurred within the Eastern District of Pennsylvania.  *See* 18 U.S.C. § 3237.

9.    As explained below, Telegram uses technological means to anonymize the location of customer account information and the methods by which Telegram stores that information. Although various other cloud-based communications platforms deploy technologies and techniques similar to Telegram for data privacy reasons, Telegram is the only major provider known to ignore certain, if not most, law enforcement requests for information. Accordingly, a search warrant issued by this court to Telegram under the Stored Communications Act, 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), would not result in "*required* disclosure of customer communications or records," and would otherwise be futile because (1) Telegram does not ordinarily, if ever, respond to legal process; (2) a search warrant or other legal process cannot be served in the jurisdiction of the location of the Subject Account's information because the location of Telegram servers is unknown and Telegram states it uses technological means, i.e., a "distributed infrastructure," to store customer account information in multiple physical locations

at any given time; and (3) even if the location of the Subject Account's information were known and the information were in a single jurisdiction, Telegram states it uses technological means, i.e., encryption, to prevent customer account information from being accessed in jurisdictions where servers are located.

## THE SUBJECT OFFENSES UNDER INVESTIGATION

10.     Title 18 U.S.C. § 2252(a)(2) and (b)(1) prohibit the knowing receipt or distribution of any visual depiction of a minor engaging in sexually explicit conduct that has been mailed or shipped or transported in or affecting interstate or foreign commerce, by any means, including by computer.

11.     Title 18 U.S.C. § 2252(a)(4)(B) and (b)(2) prohibit the knowing possession or access with intent to view matter which contains any visual depictions of a minor engaged in sexually explicit conduct that has been transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, or that was produced using materials that had traveled in interstate or foreign commerce, by any means, including by computer.

## RELEVANT DEFINITIONS ASSOCIATED WITH THE CRIMES UNDER INVESTIGATION

12.     The following definitions apply to this Affidavit and its Attachments:

a.     18 U.S.C. § 2256(1) defines "minor" as any person under the age of eighteen years.

b.     18 U.S.C. § 2256(8) defines "child pornography" in relevant part as "any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other

means, of sexually explicit conduct, where … the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct.

c.      18 U.S.C. § 2256(2) defines "sexually explicit conduct" as actual or simulated: (i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the anus, genitals, or pubic area of any person.

d.      "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or by electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

e.      "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors in sexually explicit poses or positions.

f.      "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver.  Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation.  This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

g.      "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other highspeed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related

5

to or operating in conjunction with such device" and includes smartphones, and mobile phones and devices. *See* 18 U.S.C. § 1030(e)(1).

h.      "Internet Protocol address" or "IP address," as used herein, refers to a unique number used by a computer or other digital device to access the Internet.  IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet.  IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.

i.      "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

## CHARACTERISTICS OF INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN OR VISUAL DEPICTIONS OF CHILDREN

13.    I know from my training and experience that the following characteristics are prevalent among individuals who collect child pornography:

a.      Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children, from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses (such as in person, in photographs, or other visual media), or from literature describing such activity.  Due to the accessibility and availability of child pornography on the Internet, in my recent experience, instead of maintaining collections, some offenders engage in a pattern of viewing or downloading child pornography online and then deleting the material.

6

b.      Individuals who have a sexual interest in children or images of children may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. They may also use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.      Likewise, individuals who have a sexual interest in children or images of children often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These collections can be maintained for several years and beyond to enable the individual to view the collection, which is valued highly.

d.      Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

e.      Individuals who have a sexual interest in children or images of children prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world. Based on this recognized trend, it is common for these type of offenders to save their images and videos on multiple devices, multiple

7

online accounts and multiple cloud storage accounts, and to maintain those collections indefinitely.

      f.      Individuals whose sexual interest in children or images of children has led them to purchase access to paid websites or other commercial sources of child pornography frequently maintain the financial records of those transactions at their residences.

## BACKGROUND INFORMATION ABOUT TELEGRAM

14.      Telegram Messenger (also known as "Telegram") is a cloud-based mobile and desktop messaging application purportedly owned and/or controlled by Telegram Messenger Inc. Telegram can be used on smartphones, such as Apple iOS and Google Android devices, and on desktop computers, by users to send messages and media to each other.

15.      As described by Telegram on their public-facing website,[1] as well as based on my training and experience, I am aware that Telegram is a mobile and desktop messaging application. It can be used on smartphones, such as Apple iOS and Google Android devices, and on desktop computers by users to send messages and media to each other. Telegram has reported that it has approximately one billion active users.

16.      To sign up for a Telegram account, a user must provide a phone number. Telegram users can select a username, but they are not required to do so. Usernames are unique, meaning only one Telegram user can have a particular username. Telegram users can find other users by searching for the username or by using the known phone number of a user. Users can also select a display name, such as a first and last name. Display names are not unique.

17.      Telegram offers a variety of communication methods for its users, including:

---

[1] Much of the information in this section can be found on Telegram's website, including Telegram's Privacy Policy (https://telegram.org/privacy?setln=en), Terms of Service (https://telegram.org/tos?setln=en), and FAQ page (https://telegram.org/faq?setln=en).

a. **One-on-one chats**. Users on Telegram can communicate directly with another user through a one-on-one chat. The participants can send each other text messages, photos, videos, any files, and make voice calls.

b. **Groups**. Telegram users can join a group with up to 200,000 "members." The members of a group can share messages, photos, videos, and files. A group can be public (i.e., anyone can view and post messages in the group) or private (i.e., an individual must be added to the group to see its content and/or members). Members of a group can designate "administrators," who are members of the group that control group membership and information.

c. **Channels**. The "owner" or "administrator" of the channel to broadcast messages to an unlimited number of "subscribers." Subscribers cannot post messages in the channel. A channel can be either public or private.

d. **Secret chats**. Secret chats are a type of group in which messages are end-to-end encrypted, meaning that only the sender and recipient can view the contents of the chats on their respective devices. A user can modify the settings of a secret chat to prevent the forwarding of messages and to automatically delete messages.

18.     Telegram is a cloud service that stores information and media from chats, groups, and channels on servers owned, maintained, controlled, or operated by Telegram. However, Telegram does not store information or media related to *secret chats* on its servers.

19.     If a user logs in to Telegram from a new device using their phone number, information and media stored in Telegram's cloud will sync instantly to the new device. A Telegram account can be used on multiple devices at the same time.

20.     According to Telegram's privacy policy, Telegram stores basic user account data, including mobile number, username, display name, profile picture, and e-mail address, to the extent a user has provided this information.

21.     I am aware that Telegram represents on its website that it is "based in Dubai," in the United Arab Emirates, while Telegram has also reported that it is incorporated in the British Virgin Islands. However, based on information relayed to me by members of the Department of Justice, I am aware that efforts to obtain information by serving mutual legal assistance requests on either the United Arab Emirates or the British Virgin Islands for information from Telegram have been unsuccessful.

22.     Until approximately September 2024, Telegram refused to respond to legal process from the United States. Starting in approximately September 2024, Telegram updated its privacy policy and began to respond to law enforcement requests for subscriber information, typically consisting of a user's phone number and the Internet Protocol (IP) address of the user's most recent login.

23.     I am unaware of any successful attempts by U.S. law enforcement to obtain additional information—including the contents of messages—from Telegram.

24.     Telegram's website describes how the company intentionally distributes its servers to prevent governments from obtaining communications content:

> To protect the data that is not covered by end-to-end encryption, Telegram uses a distributed infrastructure. Cloud chat data is stored in multiple data centers around the globe that are controlled by different legal entities spread across different jurisdictions. The relevant decryption keys are split into parts and are never kept in the same place as the data they protect. As a result, several court orders from different jurisdictions are required to force us to give up any data.

> Thanks to this structure, we can ensure that no single government or block of like-minded countries can intrude on people's privacy and freedom of expression. Telegram can be forced to give up data only if an issue is grave and universal

enough to pass the scrutiny of several different legal systems around the world.

To this day, we have disclosed 0 bytes of user messages to third parties, including governments.

25.     Because of Telegram's distributed infrastructure, to my knowledge it is impossible to confirm the location of any particular server(s) hosting information associated with the Subject Account. There is publicly available information indicating that Telegram has one or more data centers located in the United States. There is, however, contrary publicly available information indicating that Telegram has located all its data centers outside the United States. Investigators with the FBI have attempted to independently investigate the location of Telegram's servers using standard networking tools. Because of the ways in which Telegram's servers and network are configured, the FBI's independent efforts to determine the locations of Telegram's data centers were unsuccessful. As a result of this uncertainty, investigators cannot rule out the possibility that execution of this warrant could result in the search of a server within the United States.

26.     Based on these efforts by agents of the FBI, Telegram's representations, and my training and experience, I believe that the location of the Telegram server(s) storing information associated with the Subject Account is concealed through technological means but could potentially be in the United States.

## PROBABLE CAUSE FOR ISSUANCE OF THE WARRANT

### A.  The Investigation in New York City

27.     The investigation of Xavier Dory began in New York City in December 2022 when the New York County District Attorney's Office ("DANY") received a referral from the Internet Watch Foundation ("IWF")[2] reporting a darknet website that was advertising the sale of child

---

[2] IWF is a law enforcement entity in the United Kingdom responsible for reporting, assessing and removing child pornography or child sexual abuse material ("CSAM") on the

sexual abuse material ("CSAM") at an address ending with "*.onion*," with payment requested in bitcoin at the bitcoin address ending in "WGzF."In January 2023, DANY reviewed the darknet website to determine whether it was active and displaying or advertising the sale of CSAM. The site contained a homepage with text, "BITCH REAL RAPE MATERIAL" and "All paid videos and images are without the 'Raped Bitch' watermark." The same page contained an image of a video captioned, "Young slut bondage and raped," with a watermark reading "RAPED BITCH," showing a female child, approximately 13 years old, crying, tied up, and kneeling against a couch, with her naked torso and pants pulled down below her knees.

28.    A DANY Cryptocurrency Analyst reviewed the movement of cryptocurrency transferred and withdrawn from the bitcoin address and a related address. In March 2023, Coinbase Inc. provided records establishing a Coinbase account that used bitcoin to purchase the child pornography video was registered to Xavier Dory with a New York County address, an email address of xDory10@gmail.com, and a phone number ending in 2158. Additional records confirmed that Dory's PayPal account was linked to the Coinbase account, and an AT&T wireless account for the phone number ending 2158 was registered to Dory's mother at the address listed on Dory's New Jersey driver's license.

29.    In September 2024, DANY requested information from Mega Limited, a user-controlled encrypted cloud-based data storage and file hosting service in New Zealand, for any information related to the accounts associated with three email addresses for DORY. In November 2024, DANY obtained search warrants issued by the Supreme Court of the State of New York,

---

internet. IWF has consistently partnered with law enforcement in the United States, sending referrals pertaining to cryptocurrency addresses and websites that are associated with the sale of CSAM on the dark web. IWF maintains a hotline for reporting suspected CSAM pictures and videos found on the internet. Highly trained researchers at the IWF independently assess reported instances and share those findings with relevant legal authorities

New York County, for Mega accounts associated with Dory's email addresses. A review of the materials in Dory's Mega account associated with xrod1010@gmail.com provided a folder titled "Cp + Rape mixed." Within that folder there were approximately 261 video files depicting children, between approximately infancy to 13 years of age, engaging in sexual activity or exposing their genitals, defined as child pornography pursuant to 18 U.S.C. § 2256—

   a.   A video titled "VID-20171020-WA0047.mp4," with a duration of approximately one minute and 14 seconds, depicts the following: A woman holds an approximately two-year-old female child across her lap, facing up, with only a shirt on. A male inserts his penis into the child's vagina. The adult female rubs the child's vagina as the male inserts his penis in and out.

   b.   A video titled "VID-20171020-WA0076.mp4," with a duration of approximately 45 seconds, depicts the following: A male stands close to the camera with his erect penis in view as an approximately four-year-old female child has her mouth on his penis. The female child is standing and fully clothed and has her hands on the shaft of the male's penis. The male pushes his penis into the female child's mouth. The video cuts to the male masturbating without the child in view. When the male is about to ejaculate, the female child comes back into view, the male shoves his penis into the child's mouth, and he ejaculates in her mouth.

   c.   A video titled "VID-20171020-WA0090.mp4," with a duration of approximately 14 seconds, depicts the following: A male inserts his penis in the anus of a female child. The video shows only the female's vagina and the act of the male inserting his penis in the anus of the child. Based on my training and experience, I believe that the child is no more than six years old.

Based upon the information gathered during the course of DANY's investigation of Dory, it was apparent that Dory had moved from New York County and was residing in Philadelphia at an apartment on Fairmount Avenue. As a result, the FBI Philadelphia assumed the investigation that DANY commenced.

### B. The Investigation in Philadelphia

   30.   In June 2025, FBI Philadelphia obtained federal search warrants for Dory's Google and Mega accounts, which revealed the presence of identifiable child pornography. In October

2025, the FBI confirmed that multiple files were depictions of child victims who have been identified by law enforcement in a prior investigation. Of the files Dory stored on Mega's cloud-based account, at least 48 files depict identified minor females. Of the 48 files, at least 6 images and 2 videos depict child pornography of minor girls exposing their vaginas. The other files primarily depict child erotica, to include the minors exposing their breasts and posing in bathing suits, underwear, and bras.

31.     FBI agents conducted surveillance and open-source records checks of Dory and determined that he was residing at a house on Montrose Street in Philadelphia after moving from his apartment on Fairmount Avenue in or about late-September 2025.

### C.  The Search Warrant Execution

32.     On October 26, 2025, the FBI obtained a federal warrant issued by the Honorable Pamela A. Carlos, United States Magistrate Judge, authorizing the search of Dory's residence on Montrose Street for evidence of violations of 18 U.S.C. § 2252(a) (possession/receipt/transfer of child pornography) on Dory's electronic devices that were inside the residence and/or on Dory's person.

33.     On October 29, 2025, the FBI Philadelphia Division executed the federal warrant at Dory's residence. Dory was the only person present at the time FBI agents executed the warrant at the residence. FBI agents seized a total of three laptop computers and one cellular phone from the residence. An on-site forensic review of these electronic devices revealed the following:

   a.  The email address xrod1010@gmail.com was located on multiple devices. Multiple other email addresses were also located on the devices.

   b.  The Telegram messaging and file-sharing application was downloaded on Dory's MacBook Pro Laptop. The username associated with the Telegram application was **@jrod1010** (Subject Account). The download settings within

Telegram were set to route content from Telegram directly to file path: Users/Xavier Dory/Downloads/Telegram Desktop.

c.  A 'Telegram Desktop' Downloads folder was located and contained multiple videos, to include at least four videos of child pornography. The videos depicted prepubescent minor girls engaging in sexual activity with other adults or minors. All of the videos contained an associated creation date of <u>September 9, 2025</u>. The following is a summary description of the videos:

   i.  VID-20170317-WA0011 (1): An approximately 21-second video depicting a nude, adult male who is having his penis stroked by a nude, prepubescent girl.

   ii.  VID-20170313-WA0059: An approximately 10-second video depicting a prepubescent minor boy inserting his penis into a minor girl's anus while an adult male spreads her buttocks.

   iii.  VID-20170305-WA0204: An approximately 14-second video depicting an adult male inserting his penis into a prepubescent minor girl's mouth.

   iv.  VID-20170307-WA0112 (1): An approximately 19-second video depicting an adult male inserting his penis into a prepubescent minor girl's mouth.

### D.  The Interview

34.    Dory was interviewed by FBI agents inside of his residence. He was advised that he was not under arrest, he did not have to speak with agents, and that he was free to leave. During the interview, Dory admitted that he comes across child pornography on his Telegram application but claimed that he "looks the other way," despite understanding that child pornography depicts minors engaging in sexual activity. Dory admitted that he accesses "channels" on Telegram that share child pornography. He was shown multiple thumbnails from the "Cp + Rape mixed" folder, and he stated that he recognized them but could not explain why that folder was stored on his Mega account. Dory advised that he only viewed child pornography within Mega as a result of opening links that were sent to him via Telegram. He also admitted to: living at the Montrose Street residence; owning the computers and cellphone seized from the residence; using a Mega account

to view files sent to him via the Telegram application; using the xrod1010@gmail.com email address; using bitcoin to purchase pornography; and using PNC Bank for his banking.

### E. Dory's Arrest and the Grand Jury Indictment

35.    On October 29, 2025, Dory was arrested and charged by criminal complaint in this District with one count of receipt of child pornography, in violation of Title 18, United States Code, Section 2252(a)(2), for downloading the above-described four videos on September 9, 2025. On November 20, 2025, Dory was charged by a grand jury in this District with receipt of child pornography, in violation of Title 18, United States Code, Section 2252(a)(2), and possession of child pornography, in violation of Title 18, United States Code, Section 2252(a)(4)(B).

### F. The Requested Search for Evidence in Subject Account

36.    Dory's Apple iPhone 12 Pro remains in evidence in the custody of the FBI Philadelphia. Based upon the preliminary review of the forensic examination of Dory's cellphone, as well as the review that occurred on October 29, 2025, when Dory provided agents with consent to review the contents of his Apple iPhone 12 Pro Account, agents determined that the Telegram account linked to his Apple iPhone 12 Pro is **@jrod1010** (Subject Account). Based upon that preliminary review as well as a search of the contents of Dory's MacBook that contained images and videos depicting child pornography that were stored there upon Dory's download of these files from the Telegram application, I believe that a fulsome search of the Subject Account on his Apple iPhone 12 Pro will reveal additional evidence of Dory's commission of the Subject Offenses. Based on the foregoing, this application seeks authority to search the Subject Account and seize evidence of violations of the Subject Offenses that Dory is suspected of committing because there is probable cause to believe Dory's use of the Subject Account was intended to view and access and download child pornography.

16

37.     Based on my training, experience, and research regarding Telegram, I know the only way to obtain the full chat history and files being received and distributed is to access the Telegram server where the files are stored.

38.     The Apple iPhone 12 Pro has been securely stored at the FBI office located at 600 Arch Street, Philadelphia, Pennsylvania, 19106. Accordingly, it is reasonable to believe that the data contained on the Apple iPhone 12 Pro at the time it was seized remains undisturbed on the phone.

39.     Your Affiant believes that a remote access search of the Subject Account on Telegram servers is necessary in order to obtain complete communications and files exchanged between users regarding the receipt, distribution, possession, and access with intent to view child pornography.

## THE REMOTE ACCESS SEARCH TECHNIQUE

40.     Based on my training, experience, and the investigation described above, I have concluded that using a remote access search technique will help law enforcement access the Subject Account on Telegram servers. Accordingly, I request authority to use the remote access search technique, which will be deployed via electronic communications, to search the Subject Account. This remote access search technique will consist of one of the following actions by law enforcement: (1) law enforcement will open the Telegram app on the Apple iPhone 12 Pro used by Dory, then open and/or "refresh" chats and channels and then take screenshots and/or extract the downloaded information from the device;[3] (2) law enforcement will use a forensic tool like

---

[3] Although some information and media associated with the Subject Account will likely be stored on the Apple iPhone 12 Pro, based on my training and experience, I expect that opening or refreshing a chat may cause information and media stored on Telegram's servers to be downloaded to the device.

Cellebrite Cloud Analyzer or Oxygen Forensic Cloud Data tool to access the Subject Account in a forensic manner; (3) using tokens and encryption keys already extracted from or stored on the device and lawfully in possession of law enforcement (collectively, the "Credentials"), law enforcement will enter those Credentials into Telegram's online webpage in order to access the Subject Account; or (4) law enforcement will power on the Apple iPhone 12 Pro, enabling its internet connection in order to access the Subject Account through the Telegram application on the device, and using the Telegram application to login to the Subject Account on Telegram's online webpage. If law enforcement accesses the Subject Account using the online webpage, the forensic expert will extract the existing communications and other information from the Subject Account and then exit the Subject Account. If law enforcement accesses the Subject Account by powering on the Subject Phone and enabling its internet connection and is unable to login to the Subject Account using Telegram's online webpage, the forensic expert will conduct a manual search of the Telegram application and then re-image the Apple iPhone 12 Pro. After the search is completed, law enforcement will disconnect the Apple iPhone 12 Pro from the internet. Law enforcement will not re-access the Subject Account once this remote access search technique has been fully completed without seeking further legal process from the Court, if necessary.[4]

41.     Law enforcement will not manipulate any data in the Subject Account or create any new content in the Subject Account. Once the exporting or copying process has started, law enforcement will not obtain any new or incoming messages, posts, or other content. Once the exporting or copying process has been completed, law enforcement will log out of the Subject Account and will not access the account again without further legal process. After capturing the

---

[4] Furthermore, the remote search technique does not deny the users or administrators access to the account information, nor does the technique permanently alter any of the information stored in the Subject Account.

entirety of the Subject Account and logging out of the account, law enforcement will search the copy of the Subject Account for the information to be seized, which is listed in Attachment B.

42.     Based on my training, experience, and consultation with forensic computer experts, I know that information gathered from the remote access search can be effective in searching and seizing communications of the Subject Account in the Telegram application. This is because the information will be obtained directly from Telegram servers and may be able to defeat the various anonymization techniques that Telegram employs.

43.     The remote access search technique is designed to collect the items described above and in Attachment B, i.e., the Subject Account's Telegram chats, secret chats and group communications which may be evidence of violations of the Subject Offenses described above.

## CONCLUSION

44.     Based on the information herein, your affiant submits that there is probable cause to believe that the Subject Account has violated federal criminal laws including Title 18 U.S.C. § 2252(a)(2) and 2252(a)(4)(B), that is, the receipt, distribution, possession, and access with intent to view child pornography. Your Affiant also respectfully submits there is probable cause to believe that a remote access search of the Subject Account on Telegram servers, which is further described in Attachment A, will reveal additional evidence, fruits, and/or instrumentalities of the Subject Offenses, including the items listed in Attachment B.

45.     I further request that the Court authorize execution of the warrant at any time of day or night, as the warrant does not authorize the physical seizure of tangible property.

Respectfully submitted,

*/s/ Brandon Roche*
BRANDON ROCHE
Special Agent
Federal Bureau of Investigation

Signed and sworn to me telephonically
this 4th day of February, 2026:

Carol Sandra Moore Wells    2026.02.04 16:27:14 -05'00'
2025.001.20997

HON. CAROL SANDRA MOORE WELLS
United States Magistrate Judge

20

**ATTACHMENT A**
**Locations to be searched**

(1) One Apple iPhone 12 Pro, serial number: DNPDV4Q30D83, which is in the custody of the FBI located at 600 Arch Street, Philadelphia, Pennsylvania, 19106.

(2) The portion of Telegram servers that stores communications and other information in the account registered to "@jrod1010" on the Telegram application on Xavier Dory's Apple iPhone 12 Pro.

## ATTACHMENT B
### Items to be seized

Any and all evidence and instrumentalities of violations of 18 U.S.C. §§ 2252(a)(2) and 2252(a)(4)(B), that is, the receipt, distribution, possession, and access with intent to view child pornography, including:

1.  All files, documents, communications, images, videos, logs, and contacts associated with the Telegram account @jrod1010 related to visual depictions of minors engaging in sexually explicit conduct, child pornography, or child erotica;

2.  Records identifying the users of the account described in Attachment A;

3.  Records of names, phone contacts, phone numbers, phone call lists, incoming calls, outgoing calls, missed calls;

4.  Messages, including chat messages, secret chats messages, and group messages or recorded voice messages, which may reflect communications with co-conspirators and/or victims, along with any evidence that would tend to show the true identities of the persons committing these offenses or the identifiers of the persons depicted in the images, videos, or other files.

5.  GPS location information, maps, saved points, and any other information identifying or describing the location of the user of the device described in Attachment A.

6.  Evidence of who used, owned, or controlled the account described in Attachment A at the time the things described in this warrant were created, edited or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, user profiles, messages and message logs, photographs, and correspondence.

7.  Evidence of the time the account described in Attachment A was used;

8.  Passwords, encrypted keys, and other access devices that may be necessary to access the account described in Attachment A;

9.  Documentation and manuals that may be necessary to access the account described in Attachment A or to conduct a forensic examination of the account; and

10.  Contextual information necessary to understand the evidence described in this attachment.